# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 17, 2013 Session

## STATE OF TENNESSEE v. COY J. COTHAM, JR., also known as CORY J. COTHAM

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2636    Cheryl A. Blackburn, Judge**

---

**No. M2012-01150-CCA-R3-CD - Filed July 31, 2014**

---

Following a jury trial, the defendant, Coy J. Cotham, Jr., also known as Cory J. Cotham, was convicted of first degree premeditated murder and especially aggravated robbery and sentenced to life without parole and twenty-five years, to be served consecutively. On appeal, he argues that the trial court erred in: (1) denying his motion to suppress evidence seized pursuant to search warrants; (2) denying his motion to suppress Wi-Fi evidence; (3) denying his motion to recuse; (4) concluding that the evidence was sufficient to sustain the convictions; (5) allowing evidence of statements to the police by the victim's husband; (6) allowing evidence of threats made by the defendant; (7) allowing proof as to the affidavit of indigency; (8) instructing the jury regarding parole; and (9) setting the defendant's sentences and determining that they would be served consecutively. We have carefully reviewed the record and conclude that the defendant's assignments of error are without merit. Accordingly, the judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., joined. JEFFREY S. BIVINS, J., Not Participating.

Jeffrey A. DeVasher and William Allensworth (on appeal) and J. Michael Engle and Melissa Harrison (at trial), Assistant Public Defenders, for the appellant, Coy J. Cotham, Jr., also known as Cory J. Cotham.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Thomas Thurman, Bret T. Gunn, Katrin N. Miller, and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The crimes for which the defendant was convicted stem from the August 29, 2010 shooting death of the victim, Veronica Bozza, at her home in Hermitage, Tennessee. The victim's estranged husband, Timothy Roy Bozza, who testified as a State's witness during the defendant's trial, also was indicted for first degree premeditated murder and tried separately.

As we will set out, much of the evidence presented at the defendant's trial resulted from a series of back-and-forth cell phone calls between the defendant and Mr. Bozza, which provided a partial basis for search warrant 406. The cell phone call records were obtained by law enforcement officers pursuant to an exigent-circumstances request to the cell phone provider, rather than a search warrant. Much of the defendant's argument on appeal is based upon his view that these records were obtainable only by a search warrant, and because law enforcement officers bypassed this procedure, the cell phone call records and derivative evidence were unlawfully obtained. Accordingly, we first will review the pretrial evidentiary hearing on the defendant's motion to suppress these records.

### Suppression Hearing on Search Warrant No. 406

Detective Andrew Vallee of the Metropolitan Nashville Police Department ("MNPD") testified that, during the "late" evening on the day of the victim's murder, he made an exigent-circumstances request for the telephone records of the victim, her husband, and the defendant. His request to the phone company was for historical cell site data and historical call detail records. He obtained a search warrant the following day at the request of the lead investigator, Detective Crumby. In the search warrant affidavit, he included information from a local record check showing that the defendant had two convictions for aggravated assault. Based on a document he received from the defendant's Oregon parole officer and information from an Internet website, Detective Vallee believed the defendant also had an aggravated rape conviction although the documents stated the defendant had raped a fourteen-year-old girl. He later learned the conviction was for statutory rape. He was unable to conduct a NCIC check because he was not certified to do so.

On cross-examination, Detective Vallee said he requested the historical cell site data pursuant to Title 18 of the United States Code, section 2703. His exigent-circumstances request was "based on the fact that Mr. Bozza and [the defendant] had talked numerous times and the fact we were lied to about how many times they had actually talked. And [the defendant] and Mr. Bozza both talked immediately prior to and immediately after the murder." Detective Vallee explained that historical cell site data did not require triangulation

in that it was "simply the tower that particular phone was hitting at the time." He was able to determine that the defendant's and the victim's cell phones[1] "were hitting towers in the same vicinity."

Detective Andrew Injaychock of the MNPD testified that he provided information to Detective Vallee for the search warrant and advised Vallee that he had observed scratches on the defendant's arms. He identified photographs depicting scratches on each of the defendant's forearms.

Garen Blanchard testified that he supervised the defendant's parole after he was transferred from Oregon. Blanchard said the defendant's parole did not expire until March 17, 2012; therefore, he was on parole in August 2010. He identified the defendant's application for interstate transfer stating he agreed to abide by all the rules of both Oregon and Tennessee. Blanchard conducted an intake interview with the defendant on May 21, 2010, at which time they discussed the Tennessee rules of parole to make sure the defendant understood the insignificant differences between the Tennessee and Oregon rules. He said the defendant next reported on June 4, July 12, and August 30, 2010. Upon questioning by the trial court, Blanchard said he specifically recalled explaining to the defendant the differences between the Oregon and Tennessee rules regarding searches without warrants.

Subsequently, the trial court entered a written order on April 26, 2011, denying the defendant's motion to suppress "on the basis Defendant was a parolee at the time of the search and as part of his transfer to Tennessee he agreed to the warrantless search parole condition. However, even if Defendant had not been a parolee or had not consented to Tennessee parole conditions, the Court finds that the search warrant is valid and Defendant's motion is . . . denied on the merits."

On January 24, 2012, the defendant filed a "Re-newed Motion to Suppress Search Warrant #406 Pursuant to United States v. Jones, __ U.S. __, No. 10-1259 (Jan. 23, 2012)." Finding that there was no "'trespassory' taking of the Defendant's phone that would cause this case to fall within the parameters of the Jones ruling," the court denied the defendant's renewed motion by written order entered January 30, 2012.

## Trial

### State's Proof

Lorenza Chiarmonte Pintar, the victim's sister, testified that at the time of the victim's death, the victim and her husband were in the process of getting a divorce and were fighting

---

[1]Officers determined, after discovery of the victim's body, that her cell phone was missing.

over custody of their son. Pintar had a lengthy telephone conversation with the victim the evening of August 28, 2010, and received a voicemail message from her the next day around noon.

Father Joseph Patrick Breen, the pastor at St. Edward's Catholic Church and School, testified that the victim was "a very strong, active member" of the church and that her son was a student at the school. He last saw the victim on Sunday, August 29, 2010, as she was leaving mass around 11:35 or 11:40 a.m.

Garnett Jagels, a friend of the victim, testified that the victim left her a voicemail message on August 29, 2010, at 12:07 p.m. She said the call lasted about thirty seconds and sounded like the victim was in her car.

Brian Robinson, the victim's boyfriend, testified that he talked to the victim on her cell phone, a white iPhone, at about 11:45 a.m. on August 29, 2010, and that they made plans to drive to Fall Creek Falls that day. He stopped to get gas and snacks at 12:15 p.m. before going to the victim's house. When he arrived at the victim's house five to ten minutes later, he noticed that the garage door was open, which was unusual. The victim's car was in the garage, and her sunglasses were on the ground. Robinson saw her purse inside the car and looked inside it for her cell phone. He entered the house through the back door and saw the victim, who was bleeding, lying on the floor. Robinson called 9-1-1 at approximately 12:30 p.m., and the police arrived shortly thereafter. Robinson identified a towel that looked "very similar" to the towel the victim kept in her computer cleaning kit.

Officer Jay Brandon Reed of the MNPD testified that he was the first officer to respond to the crime scene, arriving at about 12:30 p.m. He briefly spoke to Mr. Robinson outside and then went into the house where he discovered the deceased victim. He questioned neighbors, but they had not seen or heard anything.

Detective Craig Christie of the MNPD testified that he arrived at the crime scene at 12:53 p.m. and found the victim lying on the living room floor with a pool of blood by her head. He discovered a projectile on the floor next to the victim's body, a hole in the hardwood floor, and a spent shell casing on the floor next to the wall near the back door.

Officer Johnny Lawrence of the MNPD Technical Investigations Division testified that he created a Panoscan[2] image of the crime scene, which was admitted as an exhibit. He described the appearance of the garage area and said it appeared some activity had occurred

---

[2]The witness defined the Panoscan as "a camera that sits on a tripod that will take multiple pictures 400-degrees, once that is done, we use software to put that together, so you're actually like you're standing inside of this photograph and this photograph can spin around, it's like you're inside . . . the actual scene."

near the front of the victim's vehicle. Inside the vehicle was a woman's purse on the passenger's seat. Shoes were scattered at the doorway while the rest of the house was neatly organized. From his analysis of the scene, it appeared that the victim had hurriedly entered the house and gone into the living room where there was a back door leading out to the patio. The couch appeared to have been disturbed as if someone had lifted up the cushions looking for something. Four projectiles and one shell casing were recovered from the scene. The victim had two gunshot wounds to her head and gunpowder residue on her hand, indicating that her hand was "very close to a weapon when it was fired." Officers found money on a counter in plain view a few feet from the victim's body, $400 in an envelope, and a blank check made payable to the victim from Mr. Bozza with the notation "for school fees." It appeared that the money had not been "searched through. . . . [I]t's like it [was] not important."

Lynette Mace, a civilian employee of the MNPD Identification Unit, testified that she prepared a diagram of the crime scene and processed the interior and exterior of the door leading into the garage from the kitchen area for latent fingerprints. She also assisted Officer Lawrence with lifting prints from the victim's vehicle. She collected into evidence four projectiles and one nine-millimeter shell casing. Two projectiles were recovered from holes in the floor, a third from inside a storage box beside the couch, and the fourth from the floor near the victim's body. The shell casing was located against the shoe mold near the rear patio door. She also collected hair from the victim's right hand.

Officer George Nathaniel Ward, a crime scene investigator with the MNPD, testified that he took photographs at the crime scene and collected latent fingerprints. Brenda Russell of the MNPD Identification Unit testified that she examined the latent fingerprints collected from the victim's house and that the only fingerprints she was able to identify belonged to the victim.

Officer Roy Morris of the MNPD Technical Investigations Section testified that he collected DNA swabs from Mr. Bozza and Mr. Robinson, which were sent to the Tennessee Bureau of Investigation ("TBI") laboratory for testing.

Detective Johnny Ray Crumby, Jr. of the MNPD testified that he was one of the two lead detectives assigned to investigate the homicide of the victim. He interviewed Mr. Bozza and determined that he was not present during the victim's murder based upon receipts and store surveillance videotapes showing that he was at Holt's Cee Bee Market at 12:35 p.m. and at Lowe's Home Improvement Center at 1:10 p.m. Detective Crumby reviewed telephone records, which reflected numerous calls between Mr. Bozza and the defendant the day of the murder. He said the defendant "became a person of interest . . . because it looked like [the victim's] cell phone was being used after the time of her death. And her cell phone was using towers in the locations, exactly the same point, where [the defendant's] cell towers

were being used after the homicide." Detective Crumby subsequently took a tape-recorded statement from the defendant, which was played for the jury. Detective Crumby said that the defendant's statements were inconsistent and did not match the cell phone records the officers had. The defendant was not arrested at that time, but his vehicle was seized.

After Detective Crumby executed a search warrant at the home of the defendant's mother, he began receiving threatening phone calls from the defendant who initially tried to disguise his voice. The defendant told Detective Crumby that he knew where the detective's family lived, how old his son was, and what vehicles they drove. The defendant was later arrested in Kentucky and transported back to Tennessee. As Detective Crumby was escorting the defendant to the booking station, the defendant told him he knew also where the detective's son attended school.

Felicia Evans, a crime scene investigator with the MNPD, testified that she processed the defendant's Cadillac Escalade on August 30, 2010. She identified photographs of the exterior and interior of the vehicle depicting, among other things, a black duffel bag containing a pair of white tennis shoes, two used blue latex gloves, and a collapsible cooler containing a black Nike hat and a Condor brand black tactical sleeve, which could be worn around the head as a scarf or face mask; a pawn ticket transaction from Toliver's Pawn and Loan dated August 25, 2010; two brown towels found in the backseat; a cell phone charger with a phone connected to it; a pair of black gloves; and a blue hand towel.

Timothy Bozza testified that he had been charged with the first degree murder of the victim and that he was currently incarcerated. He said he and the victim had been married about seventeen years and had one son. At the time of the victim's death, they had been separated about fourteen months and their divorce was close to being finalized. He acknowledged that he and the victim "had an issue months before about the separation and child custody" and that he lost a court hearing regarding custody arrangements for their son.

Mr. Bozza said that he had known the defendant for about thirteen years and that, about ten years ago, the defendant had lived with him and the victim for a few months. The defendant left Nashville for a period of time, and Mr. Bozza next saw him at the courthouse the day of Mr. Bozza's custody hearing. They renewed their friendship, and the defendant began working for Mr. Bozza. Asked if he and the defendant had ever discussed killing the victim, Mr. Bozza replied, "Well, yes, sir. I made a bad joke one day about a movie that – in the middle of a session we were both complaining about." He said that he brought up the issue "in a moment of anger" and that it was then dropped. He denied offering the defendant $10,000 to kill the victim. However, the defendant offered him $10,000 "to take care of Laura Yancey . . . the girl who was living with husband who had custody of his son." Mr. Bozza said he told the defendant he "could never do anything like that." Mr. Bozza denied any knowledge of the defendant's following the victim on numerous occasions prior to her

death.

Regarding the day of the victim's murder, Mr. Bozza acknowledged that he talked to the defendant several times that day but said they only talked about "average bologna kind of stuff." He said he met the defendant at a grocery store near St. Edward's Church, where he was waiting to pick up his son from the victim. The defendant was driving a minivan that belonged to the woman with whom he lived, Jennie. After they parted ways, the defendant called Mr. Bozza and said that "it was done." Mr. Bozza denied knowing what the defendant was referencing because they had discussed "a number of things that day that could have fit at that point in time." He later called the victim's cell phone and received a return call from the defendant about an hour and a half later. The defendant told him to stop calling the victim's phone because he had it. He asked the defendant why he had the victim's cell phone, and the defendant told him that "he had taken care of [Mr. Bozza's] problem and that [the victim] wouldn't be a problem for [him] anymore." Mr. Bozza said that a few weeks after the victim's murder, the defendant came by his mother's house and asked him for $35,000.

Mr. Bozza acknowledged that he had had numerous meetings with the police and the district attorney's office but denied telling them that he had any knowledge of the victim's murder prior to its happening. A redacted portion of his November 16, 2010 videotaped statement was then played for the jury. After the tape was played, the following colloquy occurred:

Q.    (By [the prosecutor])  Mr. Bozza, you admit that that's inconsistent with what you've testified to today, is it not?

A.    Yes, sir.  I was taking things in a different context.  But, yes, sir.

Q.    You were taking things in a different context today or then?

A.    No, today, sir.  That is clear what was said.

Q.    That's the truth?

A.    Yes, sir, that's what was said.

On cross-examination, Mr. Bozza said that he accepted responsibility for the statement he made "that caused everything" but denied he was taking responsibility for planning the murder of his wife. He admitted that he lied to Detective Crumby.

On redirect, Mr. Bozza admitted that his and the victim's parenting plan required that

-7-

they each carry life insurance in the amount of $350,000 payable to the other as trustee for their child.  Asked about what he said in his statement as to whether he told the defendant he would give him $10,000 to kill the victim, Mr. Bozza said, "[W]hen he offered, I said, that sounds like a good plan right there, but I can't necessarily do that [the killing] myself." Asked to clarify if he meant he would give the defendant $10,000, Mr. Bozza responded, "Well, it could be construed as that, yes, sir."  He agreed that he "never backed off of anything" and that his statement could "[a]bsolutely" be construed as an agreement to pay the defendant $10,000.

Barbara Bozza, Mr. Bozza's mother, testified that she knew the defendant through her son and that he came by her house a week or two before the victim's murder to see her son. Her son went outside and talked to the defendant for about two minutes.

Attorney Michael Rohling testified that he was retained to represent Mr. Bozza and that he was present during every statement he gave to the police except for the initial one. He said that Mr. Bozza had not been promised anything in exchange for his testimony.

Jennifer Addington testified that when she separated from her husband in July 2010, she took his nine-millimeter handgun and placed it in a maroon lunchbox cooler that she kept underneath her belongings in the back of her 2004 Honda Odyssey minivan.  She then began dating the defendant and occasionally allowed him to drive her van.  She discovered that the gun and lunchbox were missing "[s]ometime towards the end of July" and asked the defendant about it, but he denied having it.  She identified the lunchbox cooler, which was admitted as an exhibit.

Addington said that, on the day of the victim's murder, she was supposed to meet the defendant at her house at 7:30 a.m., but she was late getting home from her job in Huntsville, Alabama.  When she arrived home between 9:00 and 9:30 a.m., the defendant was not there. She went to sleep and was awakened by the defendant sometime later.  She went back to sleep and was again awakened by the defendant around 2:00 or 3:00 p.m.  The defendant left and, when he returned, he smelled like "burning leaves."  They then went to an early dinner at TGI Friday's restaurant.  Addington said that the defendant had an Android cell phone, but she noticed he had a "thinner" white phone that day.  She told the police she had not seen an iPhone, but she had "no clue" if the white phone she saw was an iPhone.

Addington said that the defendant told her not to talk to the police because that was "how they had gotten him, that they had asked him to meet up to discuss [Mr. Bozza].  And when they did, that's when they had seized his phone in his car and held him all day and not to do it, that they were going to get me like that, too.  And they were going to try to tell me all sorts of mean things – awful things about him and that it was just – for me not to do it." However, based upon her attorney's advice, she met with the police on August 31 but lied

to them in saying that the defendant was with her the entire day of the victim's murder. She subsequently met with Detective Crumby and gave the police another statement.

Addington said that before the defendant was arrested, he asked her to search her computer for news articles related to the victim's murder and "to get any and every information [she] could find on Detective Crumby and his partner." She gave the defendant some information, and the defendant asked her if she had deleted everything, which she had. The defendant also asked her to accompany him on a trip to Barbados and told her not to use her cell phone because it was tapped.

Jessica Logsdon testified that she was a family friend of Addington and also knew the defendant. She said that she went to Addington's residence between 12:00 and 5:00 p.m. on August 29, 2010, because she wanted to borrow Addington's minivan, but the van was not there. She went into Addington's residence and attempted to wake up Addington but was unsuccessful. The defendant was not there.

Jeff Walters, Jennifer Addington's ex-husband, testified that he owned a Hi-Point nine-millimeter handgun and around July 24, 2010, realized that it was missing. He filed a police report, listing Addington as a suspect. He previously had fired the weapon during target practice on his property in Ethridge, Tennessee, and assisted the police in recovering shell casings from his property. Walters said that the nine-millimeter gun depicted in a photograph admitted as an exhibit "look[ed] just like [his] gun."

John Schmahl testified that he met the defendant when he moved into the apartment across from Schmahl's and that they frequently socialized. He also knew Mr. Bozza and had done some remodeling work for him. He described the defendant and Mr. Bozza's friendship as "[c]lose. . . . [T]hey both talked about each other highly." As to the defendant's financial condition, Schmahl said that the defendant "played off to – as if he were doing very, very well. He always had stacks of hundred dollar bills." However, the defendant moved out of the apartment about a week before the sheriff's department showed up with an eviction notice. Schmahl said that the defendant had an Android phone and that he never saw the defendant without it. He acknowledged that the defendant had a "pretty fancy" vehicle with a customized license plate that read "Big Man."

Schmahl said that the defendant knew he owned a couple of guns and told him that he wanted to buy a gun for "personal protection." In July, the defendant showed him a Hi-Point nine millimeter gun in a maroon lunchbox and told him he "just bought it off of someone" for $350. Schmahl said that the lunchbox admitted into evidence was "pretty identical" to the one the gun was in when the defendant brought it to his residence.

Schmahl said that the defendant called him on August 29, 2010, at approximately 12:28 p.m. as he was driving northbound on Old Hickory Boulevard, a few blocks past the interstate. The defendant told Schmahl that he had just driven past him.

Michael Chad Wilson testified that he had known the defendant for about ten years and occasionally socialized with him. He said the defendant had a very distinctive Android phone that "probably never left his hand." The defendant called him at approximately 2:46 p.m. on August 29, 2010, and asked how to take the battery out of an iPhone. After Wilson learned of the victim's death, he contacted the police and gave a statement. After the defendant was arrested, Wilson received several telephone calls from him while he was in jail and perceived the last call to be "threatening."

Detective Andrew Injaychock of the MNPD testified that he was the co-lead detective with Detective Crumby. When he arrived at the crime scene, he noticed there appeared to have been a struggle because the couch cushions were in disarray and a window blind had been pulled off. After interviewing Brian Robinson, officers established the victim's "time frame of leaving the church to [her] residence" and determined that she had met with Mr. Bozza. Detective Injaychock interviewed Mr. Bozza who provided two receipts dated August 29, 2010, one from Holt's Cee Bee in Ridgetop and one from Lowe's in the Ridgetop area, which were admitted as exhibits. The time stamped on the Holt's receipt was 12:35 p.m., and the time on the Lowe's receipt was 1:19 p.m. Detective Injaychock later reviewed surveillance videos from the two stores, which showed Mr. Bozza in the stores during the time frames reflected on the receipts.

Detective Injaychock said that he subsequently went to Jeff Walters' farm in Ethridge where two spent shell casings were recovered from the ground. He acknowledged that the gun and the victim's iPhone were never found.

Attorney Phillip Robinson testified that he was retained to represent the victim in her divorce case in March 2010. After a court hearing, the victim was awarded more time, approximately 203 days, with the parties' child and a reduction in the amount of child support to be paid to Mr. Bozza. The time allotted to the victim "became a bone of contention and was very upsetting to Mr. Bozza." The parenting plan contained a provision requiring both the victim and Mr. Bozza to carry $350,000 in life insurance and list the other parent as the beneficiary as trustee for their minor child. Robinson said that the custody issue regarding the parenting time and the possibility of relocation had not been resolved at the time of the victim's murder.

John Russell, a financial advisor, testified that he did some financial planning for the victim and Mr. Bozza. He said that, at the time of her death, the victim had a $550,000 life insurance policy with Mr. Bozza listed as the beneficiary. Mr. Bozza approached him at the

-10-

victim's funeral and said "he needed to get together with [Russell] to discuss the insurance."

David Kline testified that he managed the mapping division of the Metropolitan Planning Department and had created over 100 maps related to the case. He identified aerial photographs depicting, among other things, St. Edward's Catholic Church, Jennifer Addington's residence, the victim's residence, TGI Friday's restaurant, the Waste Management Nashville transfer station, and 5109 Old Hickory Boulevard.[3] He also identified maps depicting a cell phone tower and the victim's residence, a Verizon cell phone tower and TGI Friday's restaurant, and an AT&T cell phone tower in Benton County. He provided distances between multiple locations and cell phone towers to Detective Vallee.

Special Agent Joel Wade of the TBI Technical Services Unit, accepted by the trial court as an expert in computer forensics and forensics of mobile devices, testified that he analyzed a Motorola cell phone with an Android operating system submitted to him in the case. He extracted from the phone the cache Wi-Fi file, which showed the actual latitude and longitude of the router at the time the phone "saw" the router, and the cached out cell file, which showed the tower location. He explained that a cache file was a "log file of the locations that that phone ha[d] seen in its past."

TBI Special Agent Richard Littlehale, accepted by the trial court as an expert in the field of communications records and criminal investigations, testified that he was the assistant special agent in charge of the Technical Services Unit. He said cell site location information, including historical records, was generally available to law enforcement officers. He explained that historical records were created by the phone company in the normal course of business and showed which particular cell tower and, in certain cases, which side of the tower the handset had communicated with. Asked to explain the geographic correlation between tower location and device location, Agent Littlehale said that he "would expect to see a handset that is communicating within a particular tower to be either within that first tier of towers or occasionally, because of interference or load balancing issues, going out to the outer second tier, . . . possibly in rare circumstances a third tier." However, based upon his experience, handsets were "generally within those inner tiers of towers closer to the towers, particularly in urban areas." Agent Littlehale acknowledged that he had not analyzed any of the records in the case.

On cross-examination, Agent Littlehale said that a handset did "not always communicate with the closest tower. The factors that influence what that handset, what choice that network will make, as far as which cell tower will communicate with a handset, depend on signal strength and also the load of the particular tower and any interference,

---

[3]The witness stated "5109" Old Hickory Boulevard, but the corresponding exhibit shows the street number as "5901."

terrain, [or] obstacles that might interfere." Based upon his experience, on most cellular networks in Nashville, the towers are between one-half a mile and two miles apart. He explained that a tier was "a set of towers that the handset could be using" and agreed that if someone was trying to find a handset, the first tier was a number of towers, perhaps close together, and the second tier was a greater number of towers. On redirect, Agent Littlehale agreed that cell phone records and tower locations did not pinpoint a handset. He said that, in criminal investigations, cell tower records were used to corroborate and/or refute evidence and alibi statements.

Detective Andrew Vallee of the MNPD Criminal Investigations Division testified that he specialized in cellular telephone records and the analysis and mapping of those records. He analyzed call detail records for the victim, Brian Robinson, Jennifer Addington, and the defendant. Using the PowerPoint presentation he created, Detective Vallee explained his findings regarding the day of the victim's murder. Because the 9-1-1 phone call was received at 12:30 p.m., he reviewed the victim's cell phone records to determine what calls were made prior to that time. The victim called Brian Robinson at 11:51 a.m., which lasted eight minutes and started with tower 3099 near St. Edward's Church and ended at tower 3108 near Interstate 40 and Stewart's Ferry Pike. She next made a thirty-three-second call at 12:01 p.m. to her sister, and that call started at tower 3108 and ended at tower 3537 located at Interstate 40 and Old Hickory Boulevard. The last phone call prior to the victim's death was made to Garnett Jagels at 12:07 p.m., with the victim's phone again connecting to tower 3537. Detective Vallee said that the most direct route from St. Edward's Catholic Church to the victim's residence was about a fifteen- to twenty-minute drive. The victim's call pattern showed that when she was at home, she connected with AT&T tower 3035, which was the closest tower. Mr. Bozza called the victim's cell phone at 1:48 p.m., connecting to antenna 3037 which was located 1.8 miles from Addington's residence. At 1:49 p.m., the victim's cell phone received a voicemail notification, which connected to AT&T antenna 3037. The voicemail was accessed at 1:50 p.m. There was no activity on the victim's phone from 7:40 p.m. that day until August 31 at 10:53 a.m. when her phone transmitted data and connected to AT&T antenna 3150 near the Waste Management Nashville transfer station located at 1428 Antioch Pike. At 1:44 p.m., her phone again transmitted data from AT&T antenna 3077 near the Waste Management Landfill in Camden, Tennessee. Detective Vallee said that the victim's cell phone was likely thrown away, went to the Nashville transfer station on Antioch Pike, and then was transported by garbage truck to the landfill in Camden.

Detective Vallee said that they had information indicating that Mr. Bozza was at Holt's Cee Bee in Ridgetop, Tennessee, at the time of the victim's murder. After analyzing Mr. Bozza's phone records, Detective Vallee learned that Mr. Bozza called the defendant thirteen times on the day of the victim's murder, seven times prior to her murder and six times afterwards. He then requested the defendant's phone records, which showed that between 10:46 and 11:05 a.m. on the day of the victim's murder, the defendant's phone was

connecting to Verizon antenna 531, near Jennifer Addington's residence. At 11:14 a.m., the defendant called Mr. Bozza, connecting to Verizon antenna 139 near Briley Parkway and Lebanon Pike. From 11:29 to 11:43 a.m., there were five calls between the defendant and Mr. Bozza, all connecting to Verizon antenna 61 near St. Edward's Catholic Church. The defendant's cell phone also connected to a Wi-Fi access point near the church at 11:54 a.m. The next activity on the defendant's phone was at 12:20 p.m., when he made a ten-second call to Mr. Bozza that connected to antenna 117, followed by another call at 12:22 p.m. that lasted 102 seconds and began with antenna 116 and ended with antenna 113. Antenna 113 was less than a mile from the victim's residence, antenna 117 was 3.06 miles, and antenna 116 was 5.14 miles. The next call placed on the defendant's phone was at 12:28 p.m. to John Schmahl that began with antenna 24 and ended with antenna 139. At 12:39 p.m., the victim's cell phone received a text message from antenna 3052, which was located near the intersection of Interstate 40 and Spence Lane. The next activity on the defendant's phone was from Verizon antenna 531 near Addington's house and included a 12:51 p.m. call from Mr. Bozza, a 2:24 p.m. call to Addington, and a 2:28 p.m. call from Addington. At 2:45 p.m., the defendant called Chad Wilson, first connecting to antenna 531 and ending with antenna 141 located at the intersection of Interstate 40 and Interstate 24. Between 3:15 p.m. and 3:23 p.m., the defendant's cell phone was connected to an antenna in the Hickory Hollow Mall area near TGI Friday's restaurant. The defendant's phone also showed a Wi-Fi connection access point near the restaurant. Jennifer Addington's call activity showed that she connected to the antenna near TGI Friday's at 3:19 p.m., which corroborated her statement to the police.

Detective Vallee said that further analysis of the defendant's call detail records showed that a Wi-Fi access point near the victim's house was logged on the defendant's phone at 6:13 a.m. on August 26, 2010, three days before the victim's murder. The defendant called Mr. Bozza that day at 6:32 a.m. and talked for seven and a half minutes.

On cross-examination, Detective Vallee agreed that the information he had was single cell site information, which was less precise than GPS or trilateration. He further agreed that the exact location of a telephone handset could not be determined based on the location of a cell tower.

Officer Mark Mittermeier of the MNPD testified that in September 2010 he was assigned to the United States Marshals Fugitive Task Force and that his unit arrested the defendant in Glasgow, Kentucky, on September 20, 2010, at Brenda Pittman's residence.

Sergeant Pat Postiglione of the MNPD testified that he recovered Ms. Pittman's work computer from her employer and turned it over to Detective Chad Gish, a forensic examiner, for analysis.

Detective Gish testified that he analyzed the defendant's Android cell phone and recovered numerous photographs. One photograph dated August 2, 2010, was of a nine-millimeter pistol with a loaded clip lying next to it. Another photograph dated August 13, 2010, was of a mattress with what appeared to be bullet holes. Detective Gish also recovered a text message Ms. Pittman sent to the defendant at 8:57 p.m. the day of the victim's murder that read, "I am so happy for you . . . it's great when a plan comes together . . . ." His analysis of Ms. Pittman's computer showed she had sent emails to an address, bigmansixnine@gmail.com, associated with the defendant's phone. One email dated August 19, 2010, ten days before the victim's murder, included attachments containing information on Barbados and processing times for passport applications. Another email dated September 17, 2010, included an attachment listing countries that do not have extradition treaties with the United States.

Toya Randolph, an employee of the Criminal Court Clerk's Office, identified a form the defendant filled out indicating that he had no job or source of income and that he owed child support.

TBI Special Agent James Russell Davis, II testified that he tested numerous items of evidence for gunshot residue. He found gunshot primer residue on the blue towel and the Condor tactical sleeve recovered from the defendant's vehicle. The residue particles contained tin and zirconium, which was unique. He analyzed the shell casing recovered from the crime scene and found that it "also had the elements tin and zirconium." Agent Davis explained that this was the first time he had seen zirconium in gunshot residue and that the shell casing was an import, apparently manufactured in Russia.

Dr. John Davis, a forensic pathologist, testified that he performed the autopsy on the thirty-nine-year-old victim and determined that her cause of death was multiple gunshot wounds. The victim had a close contact gunshot wound, which entered through her left ear and exited above her right eye. She had a second gunshot wound, which entered behind and above her left ear and exited between her ear and forehead on the right side. Both of these wounds were lethal. Additionally, the victim had a gunshot wound to her right shoulder and to her right arm, which broke her arm. Dr. Davis said that the victim had been shot "at least four times." No projectiles were recovered from the victim's body.

Dr. Laura Boos of the TBI Crime Laboratory Serology DNA Unit testified that she performed DNA testing on the blue latex gloves, blue hand towel, lunchbox cooler, and tactical sleeve recovered from the defendant's vehicle. The items contained a mixture of genetic material from more than one person. She obtained a limited DNA profile, which was consistent with the defendant, from the latex gloves. She was able to exclude the victim, Mr. Bozza, and Brian Robinson as contributors to the mixture found on the gloves. She also was able to exclude Mr. Bozza and Mr. Robinson as contributors to the genetic material on the

blue towel but was unable to exclude the defendant and the victim as potential contributors. The towel was sent to another laboratory for further testing. From the limited profile she obtained from the lunchbox cooler, the defendant could not be excluded as a contributor, but the victim, Mr. Bozza, and Mr. Robinson were excluded. The major profile on the Condor tactical sleeve "completely match[ed]" the defendant, and she was able to exclude the victim, Mr. Bozza, and Mr. Robinson as contributors. On cross-examination, Dr. Boos acknowledged that she did not find the defendant's DNA on any of the profiles obtained from the crime scene or underneath the victim's fingernails.

Jennifer Smith, a DNA analyst with Orchid Cellmark Laboratories, testified that she examined the blue towel, using a different technique than most other laboratories, and found that the "major DNA profile present on the side of the towel without writing originated from [the defendant]." The victim and Mr. Robinson could not be excluded as minor contributors, and no conclusion was reached regarding Mr. Bozza.

TBI Agent Steve Scott, assigned to the Firearms Identification Section, testified that he examined a nine-millimeter cartridge case and four nine-millimeter bullets recovered from the crime scene. The bullets had a copper steel mix, which was "a little bit unusual" and consistent with a Russian-made ammunition. He compared two cartridge cases shell casings found on the property in Ethridge, Tennessee, to the cartridge case recovered from the crime scene and determined they had been fired in the same firearm. Characteristics most common to firearms manufactured by Hi-Point were present on all three cartridge cases. Agent Scott identified the gun and magazine depicted in a photograph recovered from the defendant's cell phone as a Hi-Point semiautomatic pistol. The shell casing recovered from the crime scene had the same green coloration as the top cartridge case in the magazine.

**Defense Proof**

The defendant testified that he had known Mr. Bozza approximately sixteen years and, during the summer of 2010, was working with him as "kind of business partners." He knew that Mr. Bozza was in the process of getting a divorce and that Mr. Bozza was upset about his situation with the victim. The defendant said that it was not unusual for him and Mr. Bozza to call each other "all day long." He identified photographs of his Cadillac Escalade showing, among other things, his customized license plate which read "Big Man." He denied killing the victim, saying he spent the night before the victim's murder with Brenda Pittman in Kentucky. He said he arrived back in Nashville sometime after 10:00 a.m. the next day, August 29, 2010, went to see his son's mother, Laura Yancey, and then went to Jennifer Addington's residence. He talked to Mr. Bozza and then met with him around 11:15 a.m. near St. Edward's Church where Mr. Bozza was to pick up his son. They discussed their weekend activities and potential job bids, and the defendant left around 11:50 a.m. to meet Ms. Yancey at a parking lot near Addington's residence. While he was repairing Ms.

Yancey's older model vehicle, she drove his Cadillac Escalade to get some food. After Ms. Yancey left, the defendant realized that his phone was on the charger in his Escalade. Ms. Yancey returned around 12:28 p.m., and the defendant then went to Addington's house, arriving there at about 12:30 p.m. Around 3:00 p.m., he and Addington went to the TGI Friday's restaurant in the Hickory Hollow Mall area. He said he last talked to Mr. Bozza around 4:00 p.m.

The defendant said that he used the blue latex gloves found in his vehicle to protect his hands while cleaning his rims with "basically pure acid" that he kept in a green jug in the back of his vehicle. He explained that he used the black tactical sleeve as a face mask when doing work-related painting or sanding. He said he used the blue towel to clean his vehicle.

Regarding the photograph of a mattress with holes in it found on his cell phone, the defendant said that the mattress belonged to his mother and "was so worn out that the springs had poked holes in [it]." He denied that the holes were bullet holes and said that he and Mr. Bozza moved it out of his mother's house onto the back patio. Asked about the emails containing information about Barbados and extradition treaties, the defendant said that Mr. Bozza had taken a trip there and that the State of Tennessee had frozen one of his bank accounts as a result of his child support arrearage. The defendant said he wanted to know if would he be extradited back "for something silly like child support" if he moved to Barbados. He denied any knowledge of life insurance policies on the victim's life.

On cross-examination, the defendant acknowledged that his nickname was "Big Man." He admitted that he had a prior conviction for criminal impersonation. Regarding the thirteen phone calls between him and Mr. Bozza on the day of the victim's murder, the defendant said they "only got in touch with each other about seven of those times." He said he met Mr. Bozza at the location where Mr. Bozza was to pick up his son to tell him about his weekend activities because he could not "do it over the phone with Jennie Addington right next to [him]." He denied following the victim prior to her murder.

The defendant acknowledged that when he was arrested, he was on the phone with Ms. Addington and told her to call Mr. Bozza and tell him what had happened. He further acknowledged that he passed five or six notes to Mr. Bozza in jail, telling him to "stay strong" and "[n]ot to get depressed and take twenty-five years." He denied talking to Mr. Bozza about killing Ms. Yancey's ex-husband or the victim. He said that Mr. Bozza's comments about the victim "were like that of . . . a husband going through a divorce." He denied calling Mr. Bozza at 12:22 p.m. on the day of the victim's murder, saying that Ms. Yancey had his phone at that time because it was in his vehicle.

The defendant acknowledged that he was in the victim's neighborhood at 6:15 a.m. three days before the victim's murder but said he was there at the request of Mr. Bozza, who

had called him that morning and asked him to drive by the victim's residence to see if Mr. Robinson's car was there. Asked if he was at St. Edward's Church at the same time the victim got out of church, the defendant said, "If she got out at 11:45, then she had to have passed me." He denied asking Ms. Pittman to obtain information on any of the police officers or prosecutors. He acknowledged going to Mr. Bozza's mother's house but said that he stopped by there on his way back from Kentucky and that Mr. Bozza knew he was coming.

The defendant acknowledged that there was a past due phone bill in his vehicle and said that the pawned television was given to him by a friend who owed him money and that he "took the property and got what [he] could out of it." Regarding the form he signed under oath indicating that he had no assets, no bank account, and had not paid taxes since 2007, the defendant said he closed his bank account because it had been seized when he "got like . . . a child support letter." He elaborated, "At that point in time I wasn't about to put anymore money in the bank account if all of it was going straight – so I would save my money either by cash or just put it in another account." Asked if he had been truthful when he completed the form indicating he did not have any assets, the defendant responded, "I listed my Escalade, which is my personal asset. As far as if I'm in custody, I'm not generating any money. I'm sitting here, I'm not working, no money is coming in. So that's about as truthful as I could be. If I would have been allowed to continue working, I would have had plenty of money." The defendant said that when he returned from the west coast, "I sold a lot of things out there. I wasn't completely broke when I c[a]me back as you would have the Court assume. I had plenty of money from the things I had sold. I was just living off that." He denied being broke at the time of his arrest, saying, "At that time I didn't have cash laying around. . . . [M]y money was tied up in bills, and I made prior investments to some of the business arrangements we talked about[.]"

As to the gun that was in Ms. Addington's lunchbox, the defendant said that "probably at least . . . seven to ten days before the homicide . . . [Mr. Bozza] gave [the defendant] money for the gun." When asked to confirm that he sold the gun to Mr. Bozza, the defendant said, "No, actually it was [Ms. Addington]." Regarding threats made to Detective Crumby, the defendant said, "I'm not really one to threaten, but at the time I was upset. . . . I asked him about his son. That's not a lie. I did do that." He denied telling Ms. Addington to erase information from her computer regarding the detective's family, saying:

> When [Ms. Addington] mentioned that, she had checked on a story about [the victim]. As soon as I found out from [Mr. Bozza] about what happened, the first thing that came to my mind was [Mr. Bozza] done it. When [Mr. Bozza] tells me that he wasn't there at the time and he proved to me he was in Greenbrier, I started doing a search. Because [Mr. Bozza] swore up and down, man, I'm telling you, I had nothing to do with it. I'm like, I just

-17-

got the gun to you about ten days prior. Because him and [Ms. Addington] had had their little meeting or whatever. And me and [Ms. Addington] were checking to see what type of firearm was used in the death of [the victim].

The defendant acknowledged that he called Chad Wilson but said they talked "for barely thirty seconds . . . and didn't say anything about an iPhone or anything like that." He denied ever having the victim's cell phone.

## Penalty Phase

The parties stipulated that the defendant had three prior convictions for aggravated assault, occurring in 2001 and 1996, and certified copies of those judgments were admitted into evidence.

Maddalena Stucchi, the victim's mother, testified about how the victim's death had impacted her and the victim's nine-year-old son. She said the victim left Italy to come to the United States to fulfill her dreams. The victim's younger sister, Lorenza Pintar, testified that she and the victim were born in Milan, Italy, and that the victim and her son were the only family she had in the United States. She said the victim was her only sibling and had always inspired her to follow her dreams.

Barbara Cotham, the defendant's mother, testified about the defendant's childhood and educational history. She and the defendant's father had been married for twenty-two years but divorced in 1993 when the defendant was seventeen or eighteen years old. The defendant continued to live with her "[o]ff and on" after the divorce. The defendant dropped out of high school but had earned his GED. Ms. Cotham said the defendant and Mr. Bozza had moved a mattress and box springs for her.

The defendant's paternal aunt, Jacqueline Francis, testified there was only a three-year age difference between her and the defendant and that they "grew up together. . . . He's more like a little brother than a nephew." She said the defendant "was disappointed and very unhappy" when his parents divorced.

The jury found two statutory aggravating circumstances, that the defendant had been previously convicted of one or more felonies, other than the present charge, whose statutory elements involved the use of violence to the person and that the defendant committed the murder for remuneration or the promise of remuneration, see Tenn. Code Ann. § 39-13-204(i)(2), (4), and sentenced the defendant to life without the possibility of parole. At a subsequent sentencing hearing, the trial court sentenced the defendant as a Range I offender to twenty-five years for the especially aggravated robbery conviction, to be served consecutively to the life sentence.

# ANALYSIS

We will review the issues presented by the defendant on appeal.

## I. Motion to Suppress Evidence Seized Pursuant to Search Warrant 406

Both in the motion to suppress filed in the trial court as to search warrant 406 and on appeal, the defendant argues that "the search warrant was illegal, invalid, and unconstitutional; that the supporting affidavit was legally insufficient on its face; that the search warrant was based upon material misrepresentations in the affidavit thereto; and that the search warrant was overly broad and authorized an unconstitutionally general search."[4] Additionally, he argues that there was an insufficient nexus between the search warrant affidavit and the evidence sought by the warrant and that the "cell phone tracking information" (CPTI) or the "cell site location information" (CSLI), relied upon by the search warrant as probable cause, was obtained in violation of his rights guaranteed by the United States and Tennessee Constitutions.

The State responds that, because the defendant was on parole at the time of the search and seizure, his constitutional rights were not violated; that the obtaining of the defendant's historic CSLI did not constitute a "search;" that the search warrant did not contain materially false statements; and that, because the first warrant was properly obtained, the subsequent warrants were not fruits of the poisonous tree.

To properly assess the claims of the parties regarding these issues, it is necessary first to set out the chronology of the matter, including the relevant language of the search warrant.

As we have set out, police officers learned from their interviews with the victim's husband that he and the defendant had made telephone calls to each other the day of the victim's death. Based upon this information, officers requested and received copies of the cell phone records of the victim, her husband, and the defendant. From these records, officers learned that the victim's husband and the defendant had telephoned each other a number of times before and after her death and, as well, that her missing cellular phone received data, after her death, from cell phone towers which were being used at the same time by the defendant's cell phone. Utilizing this information, search warrant 406 was

---

[4]Chapter 991 of the Tennessee Public Acts of 2014, which limits the circumstances under which law enforcement authorities may obtain cell phone location information, became effective on June 3, 2014; and, thus, it is not relevant to our decision. Additionally, in <u>Riley v. California</u>, __ U.S. __, 2014 WL 2864483 (June 25, 2014), the United States Supreme Court held that, without first obtaining a search warrant, law enforcement officers generally could not search digital information on a cell phone which had been seized from an arrestee.

obtained by investigators from a Davidson County General Sessions Court judge on August 30, 2010. The sworn statement of facts in support of the warrant are as follows:

On 08/29/2010 Veronica Bozza was murdered at her residence at 5240 New John Hager Road in Hermitage, TN. After interviewing the victim's estranged husband, Timothy Bozza, he stated that he had only been in contact with a friend, [the defendant], with a cellular telephone number of (615) xxx-xxxx. A check of the cellular telephone records showed that Timothy Boz[z]a and [the defendant] had been in contact 7 separate times before the murder. It also showed that the two contacted each other multiple times after the murder. A check of the victim's and [the defendant's] cellular telephone records showed that both cellular phones were in the same locations at the same time starting at 11:29 a.m. until 14:45 when the victim's cellular phone was powered off. The victim was believed to have been murdered somewhere between 12:07 p.m. and 12:22 p.m. Her cellular telephone was stolen and was tracked near [the defendant's] cellular phone for the entire time span until it was powered off.

[The defendant] is a convicted felon for aggravated rape and two aggravated assaults. He is currently on parole under the Tennessee Board of Probation and Parole. He also has an outstanding order of protection against him from a separate incident that indicates he has violent tendencies.

[The defendant] was interviewed by Detectives Andrew Injaychock and Johnny Crumby on 08/30/2010 and was observed to have scratches on him. The suspect placed his cellular telephone in the [2004 tan Cadillac Escalade] and locked it to avoid Detectives obtaining it. The cellular telephone contains vital information to this homicide investigation as described above. I request that this search warrant be issued to obtain photographs, physical samples, fingerprints, and DNA from [the defendant] to further this investigation as described above.

Subsequently, the defendant filed a motion to suppress evidence obtained pursuant to this search warrant. In his appellate brief, the defendant sets out the items which were obtained or created as a result of the search warrant: a blue towel; photographs of the defendant's vehicle and items found in it; work gloves; a duffel bag; both used and unused latex gloves; a Cricket phone and cord; sunglasses; a cell phone bill; a pawn ticket; a collapsible cooler; DNA swabs; a hat and black tactical sleeve; a photograph on the defendant's cell phone of a nine-millimeter pistol; a Motorola Android cell phone and charger; maps derived from cell phone tracking information; a Wi-Fi cache file and cell cache file for the defendant's cell phone; a Tennessee Bureau of Investigation (TBI) report

regarding Wi-Fi information taken from the defendant's phone; a PowerPoint presentation based upon cell phone tracking information; photographs of a mattress; text messages and emails between the defendant and Brenda Pittman; a TBI report that a tactical sleeve from the defendant's vehicle contained gunshot residue; a TBI report that the defendant's DNA was found on both the tactical sleeve and latex gloves from his vehicle; and an Orchid Cellmark laboratory report that the blue towel from the defendant's vehicle contained his DNA.

We next will review the pertinent testimony at the hearing on the defendant's motion to suppress.

Detective Andrew Vallee of the MNPD testified that he made an exigent-circumstances request for historical cell phone data for the cell phones of the victim, the victim's husband, Timothy Bozza, and, later, for the defendant. He said his requests had been made during the "late" evening of the day that the homicide occurred and his experience was that, had he utilized a subpoena or search warrant to obtain the records, the process could have taken "anywhere from six to twelve weeks just depending on what phone company you go with and how soon they get it back." He sought the records at the request of the lead investigator, Detective Crumby, who then was at the scene talking with the defendant. Detective Vallee explained what he believed to be the "exigent circumstances":

> They were requested under exigent circumstances based on the fact that Mr. Bozza and [the defendant] had talked numerous times and the fact we were lied to about how many times they had actually talked. And [the defendant] and Mr. Bozza both talked immediately prior to and immediately after the murder.

On appeal, the defendant argues that the State failed to establish at the hearing that exigent circumstances existed, for officers were not in "hot pursuit" of the defendant and immediate access to the records was not necessary to "thwart his escape," protect others from injury, or prevent the destruction of evidence. While the State disagrees with these arguments, its primary response is that the defendant's status as a parolee meant that his Fourth Amendment rights were not violated by officers' obtaining the cell phone records without a warrant.

As to the findings by the trial court upholding the seizure of the various items, the defendant argues in his reply brief both that the record does not support the conclusion that, as a condition of his parole, he consented to the warrantless searches or that the officers conducting the searches were aware he had prior knowledge that he was subject to such searches. The State disagrees with these contentions. We will review the documents and testimony relevant to these specific claims.

The form styled "Offender's Application For Interstate Compact Transfer" bearing the signature of the defendant and dated January 8, 2010, provides, in pertinent part, "I will comply with the terms and conditions of my supervision that have been placed on me, or that will be placed on me by Oregon (sending state) and Tennessee (receiving state)." Additionally, the form acknowledges that Tennessee provisions of supervision may differ from those of Oregon:

> I understand that my supervision in another state may be different than the supervision I would be subject to in this state. I agree to accept any differences that may exist because I believe that transferring my supervision to Tennessee (receiving state) will improve my chances for making a good adjustment in the community. I ask that the authorities to whom this application is made recognize this fact and grant my request for transfer of supervision.

Exhibit J to this Oregon form, styled "General/Special Parole And Post-Prison Supervision Conditions," sets out, among several general conditions bearing the initials "CC," the scope of the consent to search:

> Consent to the search of person, vehicle or premises upon the request of a representative of the supervising officer if the supervising officer has reasonable grounds to believe that evidence of a violation will be found, and submit to fingerprinting or photographing, or both, when requested by the Department of Corrections or a county community corrections agency for supervision purposes.

Additionally, the record on appeal contains a form styled "State of Tennessee Board of Probation and Parole . . . Parole Certificate, which states in part that "said prisoner be, and is hereby paroled, subjective [sic] to the following conditions effective: [sic] . . . 8. I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." This form does not bear any signatures.

At the evidentiary hearing on the defendant's motion to suppress, Garen Blanchard testified he was the defendant's parole officer and that the parole did not expire until March 17, 2012. He conducted an intake interview with the defendant on May 21, 2010, at which time he "went over the Tennessee rules to make sure that [the defendant] understood the differences" between the Oregon and Tennessee parole rules. Blanchard "felt the rules were worded almost the exact same" and "did not have [the defendant] sign the Tennessee rules at that time but . . . did go over that parole certificate with him." Using a Tennessee parole form, Blanchard recited that condition number eight provided, as to the parolee, that "I agree

to a search without a warrant of my person, vehicle, property, or place of residence by any probation or parole officer or law enforcement officer at any time." Blanchard further said that, while the Oregon parole rules appeared to require that a parole officer be present at the time of a warrantless search, "Tennessee is one of the states where [parole officers] don't have to be present."

Following the hearings, the trial court filed a lengthy written order denying the motion to suppress the search warrant. As to the defendant's parole status at the time of the crimes, the court found that he was on parole and had been advised of the Tennessee parole conditions:

> Garen Blanchard testified that he has been with the Tennessee Board of Probation and Parole since 2007, and he has been with its sex offender unit since May 2010. Mr. Blanchard was assigned to serve as Defendant's parole officer, shortly after Defendant was transferred from Oregon to Tennessee.

> Mr. Blanchard testified that Defendant's parole was not set to expire until March 17, 2012, so he was, in fact, on parole at the time the search warrant was executed in August 2010.

> Mr. Blanchard conducted the intake interview with Defendant on May 21, 2010. At that time, Defendant was actually assigned to Mr. Blanchard's supervisor, but since the supervisor was incapacitated at the time, Mr. Blanchard was asked to perform the interview.

> Mr. Blanchard testified that during the interview he made sure to go over the Tennessee rules since they differed in wording from the Oregon rules and Defendant's application indicated he had to abide by both the Tennessee and Oregon rules.

> Mr. Blanchard said that Defendant did not sign a separate sheet regarding the Tennessee rules; however, he had initialed the rules for Oregon. All of the papers from Defendant's Oregon parole officer are contained within Collective Exhibit 8. Mr. Blanchard explained that these records came from Oregon in the standard way. According to the interstate rules, Tennessee officers are prohibited from contacting the parole officer who handled Defendant in Oregon; thus, the Tennessee Board of Probation and Parole had to rely solely on the computer records provided by the Oregon Board.

> Mr. Blanchard testified that Defendant did sign the Interstate Company [sic], which explicitly states that in applying for transfer, Defendant would be

subject to the rules of supervision under Tennessee, and there is a portion of the document where Defendant has to agree[] to abide by both states' rules.

Section 8 of the Tennessee Board of Probation and Parole Certifi[cate] (contained in Ex. 8) authorizes a search, without warrant, of a parolee's person, vehicle, property, or place of residence by any law enforcement officer at any time. Mr. Blanchard testified that he specifically explained this section to Defendant since it differs slightly from the Oregon provisions. The Oregon provision is broken into two separate rules and Oregon requires that a probation/parole officer be present for any search whereas Tennessee does not have that type of requirement. Additionally, the Oregon provision requires reasonable grounds for a search to be conducted whereas the Tennessee provision does not require a grounds [sic] for the search.

In its order on the motion to suppress, the trial court concluded that the defendant was on parole at the time of the homicide and had been told that he was subject to the Tennessee parole conditions, as testified to by his parole officer:

[I]t is clear that Defendant was on parole at the time of the search. Although the record does not contain a Tennessee Parole Certificate signed by Defendant, Probation and Parole Officer Blanchard testified that he went over the Tennessee rules with Defendant and explained how they differed from some of the Oregon rules. In addition, the Offender's Application for Interstate Compact Transfer, which was signed by Defendant on May 21, 2010, explicitly states that Defendant will comply with the terms and condition[s] placed on him by both Oregon and Tennessee. The Court, therefore, finds that Defendant was not only on parole but had been advised he would be subject to Tennessee conditions.

Further, the court concluded that "[t]he officers in this case were aware of Defendant's status as reflected by the statements about Defendant's prior criminal record and parole status set forth in the Affidavit in Support of Search Warrant." Accordingly, the court concluded that a search warrant was not needed for a search of the defendant's person or vehicle "in light of his parole status and his acknowledgment he was subject to Tennessee parole conditions, which authorize law enforcement to conduct searches."

In sum, the court found that the "Defendant was not only on parole [at the time of the search and seizure] but had been advised he would be subject to Tennessee conditions." Thus, the court concluded that, because the defendant was a parolee at the time the search warrant was obtained, "it was not necessary for the Metropolitan Police Department to obtain a warrant prior to searching Defendant and his vehicle in light of his parole status and his

-24-

acknowledgment he was subject to Tennessee parole conditions, which authorize law enforcement to conduct searches." Additionally, the court determined that the "search warrant provide[d] sufficient probable cause to conduct the search regardless of whether Defendant had been on parole at the time of the search." As to this issue of the validity of the search warrant, the court made specific findings that, prior to seeking it, officers had not sought "any GPS information from the phone records; instead, [Detective Vallee] obtained signal information which could be used to track the vicinity of two phones (triangulation)." In finding the motion to suppress was without merit, the court relied heavily upon the unreported case of United States v. Skinner, No. 3:06-CR-100, 2007 WL 1556596 (E.D. Tenn. May 24, 2007), finding that cell phone users did not have a reasonable expectation of privacy to certain historical data:[5]

> The Court finds the Skinner analysis persuasive and applicable to the issue before this Court. Specifically, as the Court alluded to during the hearing, cell phone users do not have an expectation of privacy as to cell signal data. In order to make a phone call on a cellular . . . phone, signals must be sent to cell towers through mechanisms controlled by the cell phone company. Since there is no expectation of privacy as to these signals/pings, a warrant is not necessary to procure historical cell site information used to triangulate a caller's location. Accordingly, the Court denies Defendant's motion as to this claim. The Court shall now review Defendant's additional challenges to the search warrant affidavit.

Further, the court noted:

> [T]he search warrant authorize[d] the search of Defendant's person for photographs, physical samples, fingerprints, and DNA samples as well as any cell phone in Defendant's possession, a specific cellular phone (the victim's phone identified by phone number), and a vehicle Defendant drove to the police station that is identified by make, model, and VIN number. (Affidavit in Support of Search Warrant, Collective Ex. 2). The affidavit in support of the search warrant notes that Defendant's person, cellular phones, and vehicle are currently under the control of the Metro Nashville Police Department.

The court explained why, generally, the search warrant was valid:

> Specifically, the nexus for the search of Defendant's person for the purpose of taking photographs and physical samples (including DNA and fingerprints) is self-evident. As to the phone, the affidavit sets forth detailed information from

---

[5]Subsequently, this case has been designated as "not for citation."

phone records which establishes the nexus for searching Defendant's phone and the victim's phone should it be found either on Defendant's person or inside the vehicle. As to the vehicle, the affidavit explicitly states that Defendant's phone is known to be inside his vehicle; thus, a nexus is established with the automobile.

We now will review the specific issues as to the search and seizure.

### A. Effect of Defendant's Status as a Parolee

First, we will determine the effect of the defendant's status as a parolee on his search and seizure claims. While not denying he was on parole at the time, the defendant argues that the trial court erred in finding that he had "agreed to the standard search condition used by Tennessee's Board of Probation and Parole." The State responds that the record supports the finding of the trial court that the defendant had waived his right to object to the search and seizure.

As we have set out, Garen Blanchard, a Tennessee probation and parole officer, testified that he met with the defendant on May 21, 2010, to discuss the Tennessee rules of parole with him "because they differ[ed] from Oregon in some of the wording." He said he had gone over the rules to make sure the defendant knew the differences between the Tennessee and Oregon rules and did not recall the defendant's asking any questions. He did not ask the defendant to sign the Tennessee rules because he "felt the rules were worded almost the exact same [as Oregon]." Previously, the defendant had signed a document agreeing to abide by the Tennessee rules. Blanchard testified he remembered telling the defendant that, in Tennessee, he was subject to search by "anybody who is duly sworn for law enforcement purposes or any probation or parole officer."

As to the legal authorities relevant to this issue, the State notes that, in Samson v. California, 547 U.S. 843 (2006), the Supreme Court explained why parolees had surrendered their right against what otherwise might be unlawful searches and seizures:

This Court has repeatedly acknowledged that a State has an "'overwhelming interest'" in supervising parolees because "parolees . . . are more likely to commit future criminal offenses." Pennsylvania Bd. of Probation and Parole, 524 U.S., at 365, 118 S. Ct. 2014 (explaining that the interest in combating recidivism "is the very premise behind the system of close parole supervision"). Similarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.

See Griffin [v. Wisconsin], 483 U.S. [868,] 879 [(1987)]; [United States v.] Knights, [534 U.S. 112,] 121 [(2001)].

Id. at 853.

In State v. Turner, 297 S.W.3d 155 (Tenn. 2009), our supreme court adopted the reasoning of Samson:

> A parole condition requiring that the parolee submit to warrantless searches is reasonable in light of the parolee's significantly diminished privacy interests; the goals sought to be attained by early release; and society's legitimate interest in protecting itself against recidivism. We therefore adopt the reasoning of Samson and hold that the Tennessee Constitution permits a parolee to be searched without any reasonable or individualized suspicion where the parolee has agreed to warrantless searches by law enforcement officers.

Id. at 166 (footnote omitted). The court concluded that "[a] suspicionless search of a parolee subject to a warrantless search condition, and which is conducted out of valid law enforcement concerns, is not unreasonable." Id. at 167.

As we have set out, following an evidentiary hearing, the trial court concluded that the defendant was on parole at the time of the search and seizure of his records; that he had been told he was subject to the Tennessee parole conditions, which provided for a search without a warrant; that officers were aware of his prior criminal record and parole status; and that, accordingly, a search warrant was not needed for the search and seizure of the defendant's telephone records, his person, and his vehicle. We conclude that the record, as we have set out, supports this determination by the trial court.

The defendant presents on appeal certain additional factual arguments as to why he had retained his rights against an unlawful search and seizure. He asserts that "[m]any mobile phone users are unaware that law enforcement agents have the ability to track their cellular information" and "view[] their location information as private, and expect[] it to remain private." Additionally, he argues that "society views his expectation of privacy in his cellular data and records as reasonable and justifiable under the circumstances" for it can "reveal details about the inside of an individual's residence," satisfying the objective prong of Katz.

He argues that, as a citizen, he had a reasonable expectation of privacy in the data and records that constituted cell site location information. The State responds to this assertion by saying that the defendant's rights against an unlawful search and seizure were waived

because he was a parolee and subject to the provisions of his parole agreement. As we have set out, we agree with the State.

As for search warrant 406 itself, on appeal the defendant argues that it was defective because its affidavit contained material false allegations, these being that the affidavit "overstate[d] the technological capabilities of cell phone site information in a manner that renders a false claim"; that, contrary to the affidavit, the defendant's prior sexual offense had been a conviction for statutory rape, and not aggravated rape; and that even if a photograph of the defendant showed that he "had scratches on him," they were not fresh.

Following a pretrial hearing on the defendant's motion to suppress, the trial court, in its written order, found that these claims, even if they were true, would not entitle the defendant to a hearing, as contemplated by State v. Little, 560 S.W.2d 403 (Tenn. 1978).

> [T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

Id. at 407.

"In order to be 'essential to the establishment of probable cause,' the false statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause." State v. Norris, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000).

As to the inaccuracy in the affidavit as to the defendant's prior conviction for a sexual offense, the court concluded that it had not been recklessly made:

> When preparing the Affidavit, the officers relied on information they received from Defendant's Tennessee parole officer as well as an Oregon website, and it was not possible to verify the information from these two sources prior to requesting the search warrant; Detective Vallee testified to this issue at the evidentiary hearing. The State contends the statement was made in good faith with no intention to mislead; however, should the Court determine it was recklessly made, the statement was not essential to probable cause and not require suppression of the evidence. This Court agrees.

-28-

Likewise, the apparent factual dispute regarding whether the defendant had scratches on his body did not entitle him to an evidentiary hearing:

> The defense's second objection to the Affidavit is the officer's assertion Defendant had scratches on his body. This issue also was raised during the evidentiary hearing. Detective Injaychock maintained he observed scratches on Defendant's body and marked the scratches on the photographs taken the night of the interview, which were admitted as Collective Ex. 6. The State and defense dispute whether the scratches were fresh, healing, or old wounds. The Court finds that this dispute does not provide a basis for a Franks/Little hearing.

The record supports these determinations by the trial court, that the defendant was not entitled to a Little hearing and that, even absent the assailed statements, search warrant 406 provided sufficient probable cause its issuance and the subsequent search and seizure.

As we have set out, the trial court concluded, and we concur, that a search warrant was not needed because of the defendant's status as a parolee at the time. Accordingly, his arguments as to deficiencies in the several search warrants are academic, for he had waived his right to make this claim.

## B. Suppression of Search Warrants 508, 509, 512, and 513

Additionally, the defendant argues that evidence seized through subsequent warrants 508, 509, 512, and 513 should have been suppressed because they were obtained as the result of search warrant 406, which he argues was, itself, defective. The State responds that, because search warrant 406 was lawfully obtained, search warrants 508, 509, 512, and 513 were, likewise, lawful. Previously, we have determined that, as a parolee at the time of the issuance of these warrants, the defendant had waived his Fourth Amendment rights. This waiver extended to search warrant 406, as well as to 508, 509, 512, and 513. Accordingly, this assignment is without merit.

## II. Error in Denying Motion to Suppress Wi-Fi Evidence

On appeal, the defendant argues that the holding in United States v. Jones, __ U.S. __, 132 S. Ct. 945 (2012), which reviewed whether a search warrant was required for placement of a global positioning device on a vehicle, supports his claims regarding the Wi-Fi evidence in this matter. We disagree that this case can be extended to support seizure of a defendant's cell phone records from a third party. Further claims he might have in this regard are waived because of his parolee status. Accordingly, this claim is without merit.

### III.  Error in Denying Defendant's Motion to Recuse Trial Judge

The defendant's specific complaint is that the trial judge should have recused herself from the trial of this matter because she had earlier issued several search warrants in the matter, based upon the affidavits of Detective Andrew Vallee of the MNPD.  Further, the trial court entered an order that the issuance of the warrants not be disclosed to anyone "unless such person has a bona fide need to know to comply with said search warrant."  The State responds that the defendant's recusal motion was transferred to another trial judge, who denied the motion.

Recently, in State v. William Lance Walker, No. M2011-02588-CCA-R3-CD, 2013 WL 5436704 (Tenn. Crim. App. Sept. 27, 2013), perm. app. denied (Tenn. Jan. 16, 2014), this court considered whether a trial court's issuing a search warrant required subsequent recusal from later-related issues:

> In denying the motion, the court relied on State v. Hawkins, 586 S.W.2d 465, 465 (Tenn. 1979), which states that "[i]t has long been provided . . . that the magistrate who issues a search warrant may hear and determine any contests concerning its validity or the grounds upon which it was issued."

> A trial judge should grant a motion to recuse whenever his or her impartiality can reasonably be questioned.  Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994).  Recusal is "warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge would find a reasonable basis for questioning the judge's impartiality."  Id.  The standard of review on appeal is whether the trial court abused its discretion by denying the motion.  Bd. of Prof'l Responsibility v. Slavin, 145 S.W.3d 538, 546 (Tenn. 2004); State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993).

> At the time the trial court considered the motion to recuse, the Code of Judicial Conduct stated, in pertinent part, that disqualification is required when "the judge's impartiality might be reasonably questioned, including but not limited to instances where the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]"  Tenn. S. Ct. R. 10, Canon 3.E.(1)(a) (2010).  We note that Canon 3.E.(1)(a) has since been amended to revise the section numbers, but the language remains the same as when the trial court considered the motion to recuse.  See Tenn. S. Ct. R. 10, Canon 2.11(A)(1) (2013).  A trial judge "is not disqualified from hearing a case because he or she has knowledge of the facts of the case."  State v. Thornton,

10 S.W.3d 229, 237 (Tenn. Crim. App. 1999) (citing State ex rel Phillips v. Henderson, 220 Tenn. 701, 423 S.W.2d 489, 492 (Tenn. 1968)). Likewise, a judge "who initially issues a search warrant is not thereafter so interested in the cause as to be disqualified[.]" Hawkins, 586 S.W.2d 465.

Id. at *13.

Applying the holding in William Lance Walker, we conclude that this issue is without merit.

## IV. Trial Evidence Insufficient to Sustain Convictions for First Degree Premeditated Murder and Especially Aggravated Robbery

The defendant argues that the evidence presented at trial was insufficient to support his convictions for first degree premeditated murder and especially aggravated robbery. The State disagrees.

In considering this issue, we apply the rule that when sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The State's proof established the business and personal relationship between Mr. Bozza and the defendant, as well as Mr. Bozza's being upset because of an earlier child custody hearing. He testified that custody "went from a 50/50 split to a 5/2 split instead." Mr. Bozza said that, once, he and the defendant talked about a "crisscross," as in the movie Throw Momma from the Train, and that Mr. Bozza had brought it up "in a moment of anger." Later that day, the defendant came to Mr. Bozza and offered him "$10,000 to take care of" the woman who had custody of the defendant's son. Mr. Bozza said that, after the death of the victim, the defendant told him he had followed the victim and "even run across her path directly one time." The day the victim was killed, he and the defendant talked on the telephone "a number of times." He said that, on that day, they met at a grocery store near St. Edward's Church, where the victim was dropping off their child. Later, the defendant called Mr. Bozza and said that "it was done," Bozza responding that "we have to talk later." Mr. Bozza said that, at the time, he "wasn't quite sure" what the defendant was talking about, but "in hindsight, [he] believe[s] we all understand what he was talking about." Afterwards, Mr. Bozza called the victim's cell phone and then later received a call from the defendant, telling Mr. Bozza "to quit calling her phone, that he had it, there was no need for [Mr. Bozza] to call it anymore." The defendant also told Mr. Bozza that "he had taken care of [Mr. Bozza's] problem and that [the victim] wouldn't be a problem for [Mr. Bozza] anymore." A few weeks later, the defendant asked Bozza for $35,000.

The defendant's girlfriend, Jennifer Addington, testified that she had taken a nine-millimeter Hi-Point pistol from her estranged husband and kept it in the back of her van.

"Sometime towards the end of July [2010], . . . [she] had gotten scared," thinking she might be arrested for taking the pistol, so she looked for it and found it was missing. She said that on August 30, 2010, the defendant told her of the death of the victim and asked that she utilize a computer to "see if there was [sic] any news articles . . . [h]e was concerned," and "to get any and every information [she] could find on Detective Crumby and his partner."

Addington's former husband, Jeff Walters, testified that he suspected she was responsible for taking the pistol. Detective Andrew Injaychock testified that, acting upon information from Walters that he had fired the pistol at a farm, and accompanied by him, he recovered two spent shell casings at that location. TBI Special Agent Steve Scott testified that the two spent cartridges recovered at the farm "had been fired in the same firearm that fired the cartridge case that was found at the crime scene" and that the markings on all three cartridges were "most common to firearms manufactured by a company called Hi-Point."

Detective Andrew Vallee testified that telephone records showed that, between 11:29 and 11:43 a.m., there were five calls between the defendant and Mr. Bozza, all of them connecting with an antenna "near" St. Edward's Church. Chad Wilson testified that he was an acquaintance of the defendant, and that on August 29, 2010, he received a telephone call from the defendant, asking "how to take the battery out of an iPhone." Wilson instructed him how to do so. After Wilson learned of the victim's death, he telephoned law enforcement officers and made a statement about the conversation. After the defendant had been arrested and was in jail, he telephoned Wilson, who felt that the call was threatening.

As we will explain, from all of this evidence, we conclude that a reasonable jury could have determined that Mr. Bozza was angry with the victim because of the results of a child custody hearing and discussed with the defendant his killing the victim and Mr. Bozza's doing the same to the woman who had custody of his child. The defendant stole a Hi-Point pistol from the vehicle of his girlfriend, Jennifer Addington, and used it to kill the victim. Prior to the killing, he had learned the victim's normal routine and, the morning of the crimes, had been near her church. He talked by telephone to Mr. Bozza before and after the crimes and, after shooting the victim, took her cell phone, which he kept with him for a period. Later that day, he called Mr. Bozza and said it was "done." When Mr. Bozza called his wife's cell phone, the defendant answered and said to "quit" calling the phone, and there was "no need . . . to call it anymore." A few weeks later, the defendant asked Mr. Bozza to pay him $35,000. Additionally, the defendant obtained information about the investigating officer and another witness and threatened both of them. Accordingly, we conclude that the evidence is sufficient to support both of the defendant's convictions.

### V. Error in Admitting Timothy Bozza's Interview With the Police

On appeal, the defendant argues that Mr. Bozza's prior statement does not qualify as

a prior inconsistent statement; that the court should have admitted only those portions of the statement inconsistent with his trial testimony; and that the court should not have instructed the jury that it was to consider all of Mr. Bozza's statements as substantive evidence and not just those which were inconsistent with his trial testimony. The State responds that the court dealt properly with Mr. Bozza's prior tape-recorded statement because of his denying, during the State's direct examination, important and relevant recorded assertions.

We will set out the trial events which are the basis for this assignment.

Mr. Bozza's prosecution was severed from that of the defendant, and he testified on behalf of the State at the defendant's trial. While the State's theory was that Mr. Bozza hired the defendant to kill the victim, Mr. Bozza said at trial that the defendant had misunderstood a "bad joke" of his that they "crisscross," the defendant killing Mr. Bozza's wife, while Mr. Bozza do the same to the mother of the defendant's son.

During the State's direct examination of Mr. Bozza, he was asked a series of questions regarding his contacts with the defendant shortly before and after the death of the victim. Following a series of equivocal responses by Mr. Bozza, the State asked if he had "told [the State he] had knowledge prior to the murder that this was going to happen." He first gave a negative response and, when questions continued regarding the same matter, he responded, "Well, I mean, we talked about an awful lot of things, sir." At that point, the State asked to play for the jury a prior recorded statement of Mr. Bozza, which the State represented was inconsistent with his trial testimony. After the court had questioned the State about the specifics of the statement, Mr. Bozza was further questioned as to the date the statement was recorded and who was present. After the statement was viewed by the court, the parties, and the defendant, out of the presence of the jury, the court advised counsel that the portion of the statement in which Mr. Bozza had responded to questions regarding a polygraph could not be played for the jury because it was beyond the scope of his direct examination to that point. The court ruled that the remainder was "a prior inconsistent statement [which could] come in as substantive proof."

On appeal, the defendant argues that the recorded statement did not qualify for admission under Tennessee Rule of Evidence 803(26) because it was not inconsistent with his trial testimony; even if portions of it were inconsistent, the remaining parts of the statement should not have been admitted; and that the court erred in its instructions to the jury regarding this statement.

We have carefully reviewed the trial transcript regarding this matter. While the defendant did seek clarification as to the procedure for playing Mr. Bozza's statement for the jury, it does not appear that he made the same specific objections to the statement at trial as are made on appeal. Accordingly, we conclude that this issue is waived. See Tenn. R.

App. P. 36(a). Additionally, in view of the strength of the evidence against the defendant, if the court erred in admitting the statement, the error was harmless.

## VI. Evidence of Threats by Defendant

During the trial, Chad Wilson testified that the defendant telephoned him from jail and made threatening statements; and Detective Crumby testified that the defendant made a threatening phone call to him, as well.

At trial, Chad Wilson testified that the defendant telephoned him on August 29, 2010, and asked how to remove a battery from an iPhone. In response, Wilson explained how this could be done. After Wilson learned of the victim's death, he telephoned police and told of his call from the defendant. Following the defendant's arrest, he telephoned Wilson several times, and Wilson explained that he believed the last of the calls to be threatening.

Detective Crumby testified that, after he served a search warrant at the home of the defendant's mother, he began receiving anonymous telephone calls:

Q. After you served that search warrant, did you start getting some phone calls?

A. I did.

Q. And can you just describe to the jury what was said to you basically?

A. It was basically a male's voice on my cell phone. It was a gravelly voice. He was telling me I messed with the wrong person, he knows where my family lives, you push a man so far. But it was a person trying to . . . hide their voice.

Q. Did you continue to receive these phone calls?

A. I did.

Q. And did you eventually identify who was making them?

A. I did. On one particular I believe it was morning the same call came in. I saw it was a blocked number, and I answered. It was the same gravelly voice, somebody trying to hide their, you know, voice. And during the phone call they said you put my mom in the hospital. The person on the other line. And at that minute I said, Corey, we didn't put your mom in the hospital, I was really nice to your mom. We actually got her some water and sat at the table

-35-

with her.  Then he started talking normal to me, you know, without trying to hide his voice.  And he was talking normal on the phone to me.  And he said that . . . we put his mom in the hospital, we upset her, and that we were mean to her.  He continued to state that he knows where my family lives, he knows where my parents live, he knows how old my son is, he knows what we drive.  He also said that . . . you can only push a person so far and you've messed with me and you've messed with my family and so on.

Q.  Were you actually given some police protection after those calls?

A.  I was.

Q.  Now, . . . where was [the defendant] arrested?

A.  Glasgow, Kentucky, I believe, or Barren County, Kentucky.  In Kentucky.

Q.  Did you transport him back to Tennessee to face these charges?

A.  I did.

Q.  And when you were in booking, did he make any further statements to you about you and your family?

A.  When we pulled into the back parking lot at the booking station, we got him out of the car and we were walking up to the door.  He stated that, you know, you and me are a lot alike, I've got a son, I also know about your son . . . and I know where he goes to school at Holy Rosary.  And he was talking about my son.

Q.  You perceived that to be threatening?

A.  I did.

Addington said she was "terrified" the defendant would find out she was cooperating with the police.

The defendant argues that this testimony is irrelevant and that its prejudicial effect outweighs its probative value.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Exceptional cases in which evidence of an accused's prior bad acts will be admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2011). Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Because the trial court in this matter complied with the requirements of Rule 404(b), we review its rulings under an abuse of discretion standard.

As to the telephone call from the defendant to Chad Wilson, the trial court made a pretrial finding that the testimony regarding it was admissible to show that the defendant did not own an iPhone and wanted to know how to unlock one:

The call begins with a casual conversation where Defendant indicates he was sending some guys from the Sheriff's Office to him for work and Mr. Wilson expresses his appreciation. Defendant then advises Mr. Wilson that he has received the discovery in his case and he noted that it contained information that Mr. Wilson called the police to tell them that Defendant didn't own an iPhone and that they discussed the pattern to unlock his phone. He follows up indicating that the State's "whole case consists of [Mr. Wilson] and [inaudible name sounding like John]," which he said didn't make sense to him. He concludes the phone calls with Mr. Wilson by stating: "Just know I know. Not sure what you thought was doing [sic] but not going to work. I really appreciate it (sarcasm) and hope you get what you want."

The tone of the conversation is consistent throughout and the Court finds that Defendant did not make any explicit or implied threats to Mr. Wilson. Thus, the Court cannot find that the recording is admissible on the basis Defendant threatens the witness. However, the Court does not find that there is necessarily a basis to exclude the admission of the call as the contents of the call may be deemed relevant to show Defendant admitted he did not own an iPhone and corroborate Mr. Wilson's testimony that Defendant asked him how to "unlock" an iPhone. The Court makes the preliminary ruling that the phone call is admissible; however, after hearing the evidence at trial the parties may request the Court to reassess its admissibility should the evidence regarding the iPhone be cumulative.

Additionally, the court determined that Detective Crumby's testimony regarding threats by the defendant also was admissible:

Detective Crumby served as one of the officers on this case and participated in the transport of Defendant when he was extradited to Tennessee. Presumably Detective Crumby will be testifying at trial as to the investigation of the murder. Detective Crumby testified before the Court as to the generalized threats he received from Defendant on his cell phone as well as more specific statements Defendant made about knowing the location and schedules of Detective Crumby's family members when Detective Crumby transported him. The Court finds Detective Crumby's testimony to be relevant and will permit him to testify about the threats at trial.

As to Detective Crumby, we conclude that the record supports the trial court's determination that his testimony was relevant regarding what he perceived to be threats to him by the defendant and, additionally, that its probative value outweighed any prejudice to the defendant. Further, the record supports the trial court's determination that Chad

Wilson's testimony about removing a battery from an iPhone was relevant to support his testimony that the defendant did not own such a cell phone and as to how one could be "unlocked." Additionally, on appeal, the State acknowledges the State's leading question to Wilson as to whether he perceived the call from the defendant as "threatening." However, because the defendant did not object to this question, his objection on appeal, also, is waived.

## VII. Defendant's Affidavit of Indigency as Evidence

Following the defendant's being indicted in this matter, he executed an affidavit of indigency, and the public defender's office was appointed to represent him. Subsequently, the State sought a hearing as to whether the defendant qualified for court-appointed counsel. At the hearing, the State presented evidence of his bank accounts and plans to travel to Barbados. The defense responded with evidence contrary to that of the State and showing that he had minimal assets, much less than the $25,000 to $50,000 which both sides agreed a lawyer in private practice would charge to represent the defendant in the matter. The defendant then filed a revised affidavit of indigency, stating that he had no income or money available and that his ownership of an automobile valued at $16,000 was subject to a lien.

At trial, the State argued that the indigency affidavit was admissible to show that the defendant had neither income nor assets to travel to Barbados, as he was planning to do. The defendant objected to the evidence, asserting that it was prejudicial to the defendant to show his financial status and other evidence was available to the State for what it was seeking to show. The trial court directed that the heading "Uniform Affidavit of Indigency" be removed from the copy to be admitted into evidence but that, otherwise, the affidavit was admissible to show "whether or not [the defendant] had a motive to get money."

Subsequently, at the trial, the State's lengthy opening statement included the remarks that the defendant "was in financial trouble [and] had no money . . . . That was the perfect storm. You had Mr. Bozza upset, you had [the defendant] needing money. They came up with a plan. That plan was for [the defendant] to kill Veronica Bozza for $10,000." During the cross-examination of the defendant, he was asked various questions about his distressed financial situation, sometimes with references to the affidavit of indigency. During rebuttal argument, the State asserted that the only conclusion was that "Tim Bozza [and the defendant] planned for their big event, planned to make a lot of money, solve all their problems, trip off to Barbados together where they couldn't be extradited."

On appeal, the defendant argues that the affidavit was irrelevant and should have been excluded pursuant to Tennessee Rules of Evidence 401 and 402. Citing State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004), the State responds that the evidence and related questions were relevant to show that the defendant "had a financial interest in the victim's death." We note that in State v. Reid, 213 S.W.3d 792, 813-15 (Tenn. 2006), our supreme court explained that

evidence of a defendant's financial status was relevant:

> In our view, evidence that a defendant is poor, without more, has little probative value. As observed by the Ninth Circuit Court of Appeals, "A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to . . . unfair prejudice with little probative value." [United States v.] Mitchell, 172 F.3d [1104,] 1108-09 [(9th Cir. 1999)]. The better rule, therefore, is that the State must introduce proof of "something more" than a defendant's poverty in order to meet the threshold of relevance necessary for admission.

> In this instance, "something more" was proof that despite the loss of his job without severance pay, the defendant had made several cash purchases totaling in excess of $800, had sought to invest $3000, and had over $1000 in coins in his possession at the time of his arrest. That the defendant had no legitimate source of income following the termination of his employment, coupled with proof of these expenditures shortly after the robbery, was relevant, circumstantial evidence of the commission of the crimes. Accordingly, the trial court did not err in admitting testimony about his financial condition at the time of the crimes.

Id. at 814-15.

We conclude that this issue is without merit.

### VIII. Jury Instruction as to Parole Eligibility

On appeal, the defendant complains about the response of the trial court to a question for the jurors during deliberation. We will examine this issue.

Prior to the trial, the State filed notice that it was seeking a sentence of life imprisonment without the possibility of parole. Following the jury's concluding that the defendant was guilty of first degree premeditated murder and that the State had proven the existence of both aggravating circumstances, the trial court instructed the jury, at the sentencing portion of the trial, regarding the effect and meaning of a life sentence:

> It is now your duty to determine, within the limits prescribed by law, the penalty which shall be imposed as punishment for this offense. Tennessee law provides that a person convicted of murder in the first degree shall be punished by death, by imprisonment for life without the possibility of parole, or by imprisonment for life.

The State, however, is not seeking the death penalty. A defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least fifty-one (51) full calendar years of such sentence. A defendant who receives a sentence of imprisonment for life without parole shall never be eligible for release on parole.

Additionally, the jury was instructed as to the differing available punishments of life without parole and life with parole:

Therefore, we, the jury, unanimously find that the punishment shall be either a) we the jury unanimously agree that the defendant shall be sentenced to imprisonment for life without the possibility of parole, or b) we, the jury, unanimously agree that the defendant shall be sentenced to life, to imprisonment for life.

The jury's written question was as follows:

If they change the definition of life in prison will that reduce his sentence[?] For instance, if the law changed to where someone who was sentenced to life was eligible for parole in 25 years, would [the defendant] also be eligible for parole in 25 years[?]

The trial court responded to the jury's question:

A person is sentenced according to the law in effect at the time of his crime. However, the legislature may change the law and the sentence could be reviewed.

According to the defendant, "[s]hortly after the trial court provided the jury with the supplemental instruction, the jury imposed a sentence in count 1 of life imprisonment without the possibility of parole." The defendant argues that the giving of this instruction deprived him of his right to due process of law. In response, while agreeing that the better practice would have been for the trial court simply to have referred the jury to the original instructions rather than provide the supplemental instruction, the State disagrees that it entitles the defendant to a new trial.

As the State points out, the trial court's instruction was not incorrect. In fact, the legislature could reduce the parole eligibility for life imprisonment during a term being served by the defendant. The court already had instructed the jury as to the difference in life with and without parole. Because the trial court's supplemental instruction did not alter what the jury already had been told of the differences in the two sentences, it is not apparent what

effect, if any, this instruction had on the final verdict. Accordingly, we conclude that this assignment of error is without merit.

The defendant also argues that the evidence of aggravating circumstances was insufficient. Prior to trial, the State filed notice of two aggravating circumstances:

> 1. The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;

> 2. The defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration[.]

The jury found that both circumstances were proven, and, on appeal, the defendant contests only the second – that the defendant committed the crime for remuneration or promise of remuneration. On appeal, the defendant argues that the State failed to prove this circumstance.

As for the proof that the murder was for hire, the proof is abundant. Mr. Bozza acknowledged that a few weeks after the defendant told him that the victim "wouldn't be a problem for [Mr. Bozza] anymore," he came to Mr. Bozza's house and asked for $35,000. Regarding the death of the victim, Mr. Bozza responded to the State's questions regarding the tape-recorded statement given by him regarding his arrangement with the defendant to kill the victim:

> Q. And that tape that we just watched, that meeting was called by your lawyer–

> A. Yes, sir.

> Q. – and you heard me state – the reason being you were finally going to acknowledge there was a monetary agreement between you and [the defendant]; is that correct?

> A. Well, I wanted to get as much of the truth out as I was remembering at the time, yes, sir.

> Q. And did you not say, I told him I would give him $10,000?

> A. Well, the statement was made that – when he offered, I said, that sounds

like a good plan right there, but I can't necessarily do that myself.

Q. Yeah, you couldn't do the killing yourself?

A. No, sir.

Q. But then you said you would give him $10,000. Isn't that what that said?

A. Well, it could be construed as that, yes, sir.

Q. Was it said, construed? Did you not just say you could give him $10,000? And then you said you didn't back off?

A. Exactly right. I never backed off of anything, no, sir.

Q. Okay. So that could be construed to have an agreement to pay $10,000?

A. Yes, sir, it could be. Absolutely.

Based upon this evidence, we conclude that a reasonable jury could have determined that the killing of the victim was committed for remuneration or the promise of remuneration.

## IX. Errors in Sentencing

The defendant asserts that the trial court erred both in sentencing him to twenty-five years for his especially aggravated robbery conviction and ordering that it be served consecutively to his life sentence for first degree premeditated murder. The State responds that the record supports the trial court's sentencing of the defendant.

In State v. Pollard, __ S.W.3d __, 2013 WL 6732667, at *7 (Tenn. 2013), our supreme court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." In this matter, the trial court conducted an extensive sentencing hearing, explaining why the defendant's sentences would be served consecutively:

So, that leads us to the next issue in that whether or not he should get consecutive or concurrent sentences. Now, I do find that he is an offender whose record of criminal activity is extensive and in so doing I can also consider the homicide in that, but he has a long record that goes back for a long way and it, and when you look at it it is aggravated assault, aggravated assault, assault, assaults, assaults, lots of times involving women.

I think he has a record which is extensive with regard to that and he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Clearly, he is a dangerous offender. He, . . . based on the testimony at trial[,] killed . . . [the victim] with absolutely no, quickly, followed her, did it for his boss and there was obviously some discussion about the insurance money. This is a dangerous offender . . . who stalked someone, went in on them, killed them and left.

. . . .

. . . Now, Wilkerson factors apply. For factor number 4, and that is in order to have consecutive sentences it has to be based on the fact that the aggregate term reasonably relates to the severity of the offenses and it is necessary in order to protect the public from further serious criminal conduct by the defendant.

Now, [defense counsel] makes a point that he has already been sentenced to life without the possibility of parole and that therefore it's not necessary to protect the public further from serious criminal conduct by the defendant. However, that in and of itself is not something that I need to look at. Though, I find in this particular case given the history of [the defendant] throughout the criminal history that is felonies after felonies, probation violations, probation violations, and then the very serious nature of this offense, which I have described and I will rely on the facts in the record about the nature of this offense and just sort of the coldness and the way [the victim] was executed, I find that it is necessary to protect the public from further serious criminal conduct by the defendant. So, I am sentencing him to 25 years and it will be a consecutive sentence.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is an offender whose record of criminal activity is extensive," that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," or that "[t]he defendant is sentenced for an offense committed while on probation." Tenn. Code Ann. § 40-35-115(b)(2), (4), (6) (2010). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings

that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). The criteria listed in section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

The record abundantly supports the determination of the trial court that the defendant has an extensive criminal record and that he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Further, the trial court concluded that consecutive sentencing was necessary because of the severity of the offenses and the need to protect the public, and the record supports this finding as well. This assignment is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE